ANNE ANDREWS (Bar No. 103280)
aa@andrewsthornton.com
JOHN C. THORNTON (Bar No. 84492)
jct@andrewsthornton.com
SEAN T. HIGGINS (Bar No. 266888)
shiggins@andrewsthornton.com
ROBERT S. SIKO (Bar No. 312856)
rsiko@andrewsthornton.com
**ANDREWS & THORNTON**
4701 Von Karman Ave, Suite 300
Newport Beach, California 92660
Telephone:   (949) 748-1000
Facsimile:    (949) 315-3540

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

PATRINA DEAN,

        Plaintiff,

   v.

L'ORÉAL USA, INC.; L'ORÉAL
USA PRODUCTS, INC.; SOFT
SHEEN/CARSON, INC.; GODREJ
SON HOLDINGS, INC.;
STRENGTH OF NATURE, LLC;
and DOES 1-100, inclusive,

        Defendants.

**CIVIL ACTION NO. 2:23-CV-00443**

**COMPLAINT FOR DAMAGES**

**JURY DEMAND**

## COMPLAINT

Plaintiff PATRINA DEAN, through undersigned counsel, makes the following Complaint against Defendants L'ORÉAL USA, INC.; L'ORÉAL USA PRODUCTS, INC.; SOFT SHEEN/CARSON, INC.; GODREJ SON HOLDINGS,

INC.; STRENGTH OF NATURE, LLC; and DOES 1-100, inclusive (collectively, "DEFENDANTS"), and alleges and states as follows:

## NATURE OF THE ACTION

1.    This action arises out of PATRINA DEAN's diagnosis of uterine cancer. Ms. DEAN's uterine cancer was directly and proximately caused by her regular and prolonged exposure to phthalates and other endocrine disrupting chemicals found in DEFENDANTS' hair care products.

2.    Plaintiff brings this action against DEFENDANTS for claims arising from the direct and proximate result of DEFENDANTS, their directors, agents, heirs and assigns, and/or their corporate predecessors', negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products known as "Dark & Lovely" and "Soft & Beautiful" (collectively, the "PRODUCTS.")

## I.    PARTIES

3.    Plaintiff is, and at all times relevant to this action was, a citizen and resident of the State of California with her place of residence in Hawthorne, Los Angeles County, California.

4.    Defendant L'Oréal USA, Inc. is, and at all times relevant to this action was, a Delaware corporation with its principal place of business and headquarters located at 575 5th Ave., 28th Fl., New York, NY 10017.

5.    Defendant L'Oréal USA PRODUCTS, Inc. is, and at all times relevant to this action was, a Delaware corporation with its principal place of business and headquarters located at 112 Madison Ave., 12th Fl., New York, NY 10016.

6.    Defendant SOFT SHEEN/CARSON, INC. is, and at all times relevant to this action was, a Delaware corporation with its principal place of business and headquarters located at 575 5th Ave., New York, NY 10017.

2

**COMPLAINT FOR DAMAGES**

7.    On information and belief, Defendant L'Oréal USA PRODUCTS, Inc. and SOFT SHEEN/CARSON, INC. are subsidiaries of Defendant L'Oréal USA, Inc. DEFENDANTS L'Oréal USA PRODUCTS, Inc., SOFT SHEEN/CARSON, INC. and L'Oréal USA, Inc. are collectively referred to herein as Defendant "L'ORÉAL."

8.    Defendant GODREJ SON HOLDINGS, INC. is, and at all times relevant to this action was, a Georgia corporation with its principal place of business and headquarters located at 64 Ross Road, Savannah, GA 31405.

9.    Defendant STRENGTH OF NATURE, LLC is, and at all times relevant to this action was, a Georgia limited liability company with its principal place of business and headquarters located at 64 Ross Road, Savannah, GA 31405. On information and belief, Defendant STRENGTH OF NATURE, LLC is a subsidiary of Defendant GODREJ SON HOLDINGS, INC. Defendant STRENGTH OF NATURE, LLC and GODREJ SON HOLDINGS, INC. are collectively referred to herein as Defendant "STRENGTH OF NATURE."

10.    The true names or capacities, whether individual, corporate, or otherwise, of Defendants DOES 1 through 100, inclusive, are unknown to Plaintiff who is therefore ignorant of the true names and sue said Defendants by such fictitious names. Plaintiff believes and alleges that each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiff as alleged herein.

11.    At all times hereinafter alleged, "DEFENDANTS" or "All DEFENDANTS" include all herein named Defendants as well as Defendants DOES 1 through 100, inclusive.

12.    At all times material hereto, All DEFENDANTS were engaged in the research, development, manufacture, design, testing, assembly, packaging, labeling, preparation, distribution, marketing, supply and sale of the PRODUCTS,

**COMPLAINT FOR DAMAGES**

and introduced such PRODUCTS into interstate commerce with knowledge and intent that such PRODUCTS be sold in the State of California.

13.    At all times material hereto, DEFENDANTS researched, developed, manufactured, designed, tested, assembled, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective PRODUCTS, including but not limited to:

a.    Dark & Lovely; and

b.    Soft & Beautiful.

14.    These PRODUCTS were all sold either directly or indirectly, to members of the general public within the State of California, including Plaintiff.

15.    DEFENDANTS' defective hair PRODUCTS were placed into the stream of interstate commerce and were used by the Plaintiff from in or around 1973 until in or around 2005.

16.    In or around March 2022, Plaintiff was diagnosed with uterine cancer, a diagnosis caused by Plaintiff's exposure to chemicals in the DEFENDANTS' hair care PRODUCTS. As a result of this devastating diagnosis, Plaintiff has and continues to undergo treatment including chemotherapy and a total hysterectomy.

## II.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because DEFENDANTS, and each of them, is a citizen of a state other than the state in which Plaintiff is a citizen.

18.    Venue in this District is proper under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District and Plaintiff resides in this District.

19.    This Court has personal jurisdiction over DEFENDANTS because DEFENDANTS conduct business in California, purposefully direct and/or directed their actions toward California, consented to being sued in California by registering

**COMPLAINT FOR DAMAGES**

an agent for service of process in California, and/or consensually submitted to the jurisdiction of California when obtaining a manufacturer or distributor license, and have the requisite minimum contacts with California necessary to constitutionally permit this Court to exercise jurisdiction. Moreover, DEFENDANTS' actions and/or inactions described herein were purposefully directed at and/or within the State of California in that they sold PRODUCTS directly to Plaintiff within the State of California, the damages were sustained by Plaintiff within the State of California, and the damages sustained by Plaintiff were a result of DEFENDANTS' actions and/or inactions—described herein—that were purposefully directed at and/or within the State of California.

### III.    FACTS COMMON TO ALL COUNTS

A.    <u>Marketing and History of Hair Relaxers</u>

20.    It is not surprising that the hair care industry targets Black consumers with specific products, because in the U.S., Black consumers spend over $1 trillion each year, with a significant amount of that spending toward hair care products.

21.    In its natural or virgin state, afro-hair texture is characterized by coily, springing, zigzag, and s-curve curl patterns; as well as its density, fullness, texture, and feel. Afro-textured hair naturally grows up and out. In Africa, hair was seen as a source of personal and spiritual power. Although most styling was extremely intricate and involved days of labor, it was a routine practice.

22.    One of the first things slave masters did to enslaved people forced to American soil was cut their hair. What was once a symbol of pride and symbolism became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

23.    The very nature of slavery involved working long hours in dire conditions. Enslaved people had no time to care about their hair. The hair that was once an important spiritual and cultural symbol became tangled and matted.

**COMPLAINT FOR DAMAGES**

24.     White Americans did not see African or Black hair as beautiful. African hair that was once considered an attractive feature became a source of shame, to be covered or cut.

25.     In 1786, the Governor of Louisiana, Don Esteban Miro, passed the "Tignon Law" requiring Black women to wear a tignon (scarf) over their hair as a way of signifying they were members of the slave class, even if they were free.

26.     This law sent a direct signal to Black people that their hair held a symbol of inequality and was a sign of poverty regardless of their actual social status.

27.     Because afro-textured hair was kinky and reflected African heritage rather than European ancestry, afro-textured hair was a symbol of low social status.

28.     Slaves with lighter skin and less coily hair were favored to work in the home, a far less strenuous position than in the plantation fields. And so, since the 19th century, Black women have been pressured to adopt Eurocentric standards of beauty, specifically to straighten their kinky, curly or coily hair. This fueled the desire for tools and products that could straighten Black hair texture.

29.     Black, or afro-textured hair, can be manipulated into a straightened state with the use of hair tools and hair products. Prior to the invention of the chemical relaxer in the 1900s, individuals would "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to temporarily straighten them.

30.     The hot comb was first invented by Frenchman, Marcel Grateau, who popularized the hair styling tool in Europe in the 1870s, including advertisements in catalogs of major department stores. The hot comb was later modified by Madam C.J. Walker, a trailblazer in the development of black hair products, to be manufactured with wider comb teeth. With Walker's system, once the comb was heated, a softening ointment was then applied for easier manipulation of black hair.

**COMPLAINT FOR DAMAGES**

31.    Today, afro-textured hair is still often straightened with a hot comb rather than with chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by which curly-kinky hair that has been temporarily straightened coils back into its natural state once the hair interacts with water, humidity, or perspiration, creating a shorter or fuller appearance.



32.    African American inventor Garrett Augustus Morgan, discovered and created a system that would permanently straighten afro-textured hair, eliminating the issue of "shrinkage."

33.    In additional to being an inventor, Morgan was a tailor. In the early 1900s, Morgan was repairing his sewing machines and creating a way to polish the needles to stitch fabrics more smoothly. He applied a chemical solution to the needles and wiped the solution off with a rag and later noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.

7

**COMPLAINT FOR DAMAGES**

34.    Morgan further tested the chemical on a dog with curly hair and eventually on his own hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair product, creating the G.A. Morgan Hair Refining Cream which was marketed in 1913.



35.    Morgan's invention paved the way for the alkaline relaxer and later development of additional chemical-based permanent hair straightening products in the Black hair care market.

36.    In or about 1971, Dark & Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.

37.    In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking. As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in or about 1981, which used milder chemicals such as potassium hydroxide and lithium hydroxide.

38.    Today, DEFENDANTS market their hair relaxer PRODUCTS to African American customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. DEFENDANTS' marketing

**COMPLAINT FOR DAMAGES**

scheme relies heavily on branding and slogans that reinforce straight hair as the standard.

39.    Defendant STRENGTH OF NATURE markets its Soft & Beautiful products depicting beautiful, happy, fair-skinned African American women with straight hair in seeming perpetual motion.



40.    Defendant L'ORÉAL, which later acquired Dark & Lovely, depicts a Black woman with straight hair on each of its Dark & Lovely brand of relaxer products.

41.    Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

42.    Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug and beauty supply stores in urban and rural cities throughout the United States.

43.    Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks (4 – 8 weeks on average), depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional

**COMPLAINT FOR DAMAGES**

relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches," resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

44.    Hair relaxers can, and often do, cause burns and lesions on the scalp, facilitating entry of hair relaxer constituents into the body. The main ingredient of "lye" relaxers is sodium hydroxide; "no-lye" relaxers contain calcium hydroxide and guanidine carbonate; and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

45.    In some studies, up to 90% of Black and Brown women have used hair relaxants and straighteners, which is more commonplace than for any other race. Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.

46.    Once relaxer use begins in childhood, it usually becomes a lifetime habit.

47.    The reasons for Black women's use and dependence upon hair straightening products are associated with various factors, including (1) slavery and internalization of acceptable beauty norms, (2) media and advertisements, (3) assimilation and economic security, (4) ease of hair maintenance, and (5) culture.

48.    In a culture where Black women feel reduced to a lower standard of beauty, these factors impact women of color's decisions to begin and continue using products to alter the natural state of their hair, many times as a protective mechanism against racial discrimination. In the Dove CROWN Study for girls (2021) conducted by JOY Collective, the following statistics were discovered:

**COMPLAINT FOR DAMAGES**

a.  100% of Black elementary school girls in majority-white schools who report experiencing hair discrimination state they experience the discrimination by the age of ten (10).

b.  86% of Black teens who experience discrimination state they have experienced discrimination based on their hair by the age of twelve (12).

c.  66% of Black girls in majority-white schools report experiencing hair discrimination compared to 45% of Black girls in all school environments.

d.  53% of Black mothers, whose daughters have experienced hair discrimination, say their daughters experienced the discrimination as early as five (5) years old.

e.  47% of Black mothers report having experienced discrimination related to their hair.

f.  Trauma from these experiences cause girls to miss days from school; teenage Black girls are missing a week of school per year due to hair dissatisfaction.

g.  While 90% of Black girls believe their hair is beautiful, the microaggressions and discrimination she endures has an impact on how she sees herself.

h.  Black women are 1.5 times more likely to be sent home from the workplace because of their hair.

i.  Black women are 80% more likely than white women to change their hair from its natural state to fit in at the office or other social settings.

B.    Regulation of Hair Relaxers

49.    The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed into the marketplace. The two most

important laws pertaining to cosmetics marketed in the United States is the Federal Food Drug and Cosmetic Act ("FDCA") and the Fair Packaging and Labeling Act ("FPLA.")

50.    The FDCA expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

51.    Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging, shipping or handling.

52.    Under the FDCA a cosmetic is adulterated if: 1) it bears or contains any poisonous or deleterious substance causing injury to the product user or 2) if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

53.    Misbranding refers to violations involving improperly labeled or deceptively packaged products.

54.    Under the FDCA, a cosmetic is misbranded if 1) its labeling is false or misleading, 2) the label does not include all required information, 3) required information is not prominent and conspicuous, or 4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.

55.    Under U.S. law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended. An example is methylene chloride because it causes cancer in animals and is likely to be harmful to human health too.

56.    On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously-authorized phthalates to be used as food additives because these uses have been abandoned by industry. The FDA revoked authorizations for the food contact use of 23 phthalates and two other

substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.

57.    Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients. However, the FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic and (b) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.

58.    Except for color additives and ingredients already prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the FDCA and other applicable regulations.

59.    With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products. Section 740.1 states that "[t]he label of a cosmetic product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product." (Emphasis added). This warning requirement directly correlates with the broad authority of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under the FDCA and other applicable regulations.

**COMPLAINT FOR DAMAGES**

60.    In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers anytime a health hazard may be associated with their products. As described herein, a wealth of scientific information is available demonstrating hair relaxers, straighteners and hair dyes contain certain endocrine-disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color. There simply was no legal obstacle to and, in fact, there was a legal requirement they take action as alleged herein.

C.    Endocrine-Disrupting Chemicals

61.    The endocrine system is indispensable for life and influences nearly every cell, organ, and process within the body. The endocrine system regulates all biological processes in the body from conception through adulthood, including the development of the brain and nervous system, the growth and function of the reproductive system, as well as metabolism and blood sugar levels.

62.    The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.

63.    Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical signals that control or regulate critical biological processes.

64.    When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.

65.    The precise functioning of the endocrine system is vital to maintain hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse-health effects,

**COMPLAINT FOR DAMAGES**

including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.

66. Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, that interfere with the normal activity of the endocrine system. They can act directly on hormone receptors as mimics or antagonists of hormones, or on proteins that control hormone delivery. In other words, EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones. They can even modify DNA that regulates whether genes are turned on or off, or alter the structure of target cells' receptors themselves.

67. As a result, EDCs are known to cause numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, and neurological and learning disabilities.

68. Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes," and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified estrogens, phthalates, and parabens as EDCs.

69. Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids are also referred to as "plasticizers" based on their most common uses. Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave lotions, cleansers, and shampoos. However, the difference between these other cosmetic products and hair care PRODUCTS is that the nature of and application of these other products makes it extremely unlikely their ingredients are absorbed through the skin and into the body through burns or lesions. However, as alleged,

the nature of PRODUCTS and how they are used means that frequently users absorb ingredients in PRODUCTS into their skin through burns or lesions. The exposure mechanism by which users, including Plaintiff, are exposed to dangerous chemicals like EDCs contained in PRODUCTS are thus unique to hair relaxers and straighteners.

70.    At all relevant times herein, on information and belief, phthalates were used in DEFENDANTS' PRODUCTS.

71.    As mentioned, phthalates are known EDCs which interfere with natural hormone production and degradation and are detrimental to human health. Despite the short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.

72.    Under the authority of the FPLA, the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

73.    However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients, meaning phthalates evade listing when combined with a fragrance. As a result, a consumer, including Plaintiff, is not able to determine from the ingredient declaration on the label if phthalates were present in a fragrance used in the herein referenced hair PRODUCTS used by the Plaintiff and placed into the stream of commerce by DEFENDANTS.

74.    Since 1999, the Centers for Disease Control have found phthalates in individuals studied for chemical exposure.

75.    One such phthalate is Di-2-ethylhexylphthalate63 ("DEHP"), which is a highly toxic manufactured chemical that is not found naturally in the environment.

**COMPLAINT FOR DAMAGES**

It was first used in 1949 in the United States and has been the most abundantly used phthalate derivative in the twentieth century.

76.     Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure. The Agency for Toxic Substances and Disease Registry estimates that the range of daily human exposure to DEHP is 3–30 µg/kg/day. The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerate daily intake is 48 µg/kg bodyweight.

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
|---|---|---|---|---|
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde. N.C. = not calculated by OEHHA as of August 2020.[72]

77.     When DEHP enters into the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites, which include the primary metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthlate (MEOHP).

78.     Unsurprisingly, DEHP and its metabolites, like other phthalates, are known to cause significant adverse-health effects in humans including, but not limited to, endometriosis, developmental abnormalities, reproductive dysfunction and infertility, various cancers, and metabolic syndrome.

79.     Selected animal studies, along with human epidemiological data, suggest associations between DEHP exposure and reproductive effects. Human epidemiological studies demonstrate an association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males, as well as

**COMPLAINT FOR DAMAGES**

earlier menopause, low birth weight, pregnancy loss, and preterm birth. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

D.    Uterine Cancer Caused by Exposure to Endocrine Disrupting Chemicals

80.    Uterine cancer is caused by phthalate metabolites found in hair care PRODUCTS.

81.    Every year around 65,000 females develop uterine cancer in the USA alone, out of which more than 90% is of endometrial origin.

82.    A study recently found that women who use chemical hair straightening or relaxing products have a higher risk of contracting uterine cancer. Che-Jung Chang, et al., Use of Straighteners and Other Hair Products and Incident Uterine Cancer, Journal of the National Cancer Institute, Oct., 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/.

83.    The study found that an estimated 1.64% of women who never used chemical hair straighteners or relaxers would go on to develop uterine cancer by the age of 70; but for frequent users, that risk more than doubles, increasing to 4.05%.

84.    More specifically, the hazard ratio for women using hair straightening and relaxing products more than four times in a year was 2.55 ($p < .005$) for uterine cancer compared to women who did not. This was after adjusting for confounders like race and obesity. Although Black women use these products much more frequently than white women, they were not more likely to develop uterine cancer than white women based on race.

85.    Of course, on a global level, the impact on Black women is more pronounced, meaning that while they are not more likely to develop uterine cancer based on their race, since they make up the overwhelming majority of hair straightening and hair relaxing products users, including as users of

**COMPLAINT FOR DAMAGES**

DEFENDANTS' PRODUCTS, across the population more, Black women will develop uterine cancer from use of the PRODUCTS.

86.    The authors also had an explanation for why other hair care products, that may also contain EDCs, did not see the same increased risk of uterine cancer:

> Notably, chemical exposure through the pathway of hair product use, especially straighteners, could be more concerning than other personal care products. Higher percutaneous absorption of chemicals has been observed in scalp compared with other skin such as on the forearm, palm, and abdomen (60). Straightener use may cause scalp lesions and burns, which facilitates the permeability of chemicals through the scalp (61,62). Heating processes such as flat ironing or blow drying during straightening treatments could release or thermally decompose chemicals from the products, leading to potential higher exposures to hazardous chemicals among the users (63,64).

E.    Ms. DEAN's Use of Hair Relaxing PRODUCTS

87.    Ms. DEAN was first exposed to EDCs and/or other toxic ingredients around 1973, at or around the age of 22, when she began using DEFENDANTS' PRODUCTS. Specifically, Plaintiff DEAN used Dark & Lovely from in or around 1973 until in or around 2005. Likewise, she used Soft & Beautiful from in or around 1973 until in or around 2005. She used the PRODUCTS on a monthly basis.

88.    Ms. DEAN used DEFENDANTS' PRODUCTS by applying them to her scalp exactly as instructed by DEFENDANTS.

89.    Ms. DEAN would keep the PRODUCTS on her hair for the time allotted in the instructions.

90.    There was never any indication, on the PRODUCTS packaging or otherwise, that this normal use could and would cause her to develop uterine cancer. Had she been made aware of such risk, she would not have used the PRODUCTS.

91.    Ms. DEAN was diagnosed with uterine cancer in or about March 2022.

**COMPLAINT FOR DAMAGES**

She is receiving chemotherapy and had a total hysterectomy as a result of her cancer diagnosis.

92.   Ms. DEAN continues to have follow up appointments.

93.   As a result of DEFENDANTS' acts and/or omissions, Ms. DEAN has suffered uterine cancer, extreme pain and suffering, and extreme emotional distress.

## COUNT ONE

### STRICT PRODUCTS LIABILITY

### (FAILURE TO WARN)

94.   Plaintiff incorporates by reference paragraphs 1 through 91 as if fully set forth herein.

95.   At all times material to this action, the DEFENDANTS were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities, cosmetic PRODUCTS in the regular course of business, which are defective and unreasonably dangerous to users and/or consumers of the product, including Plaintiff.

96.   At all times material to this action, the PRODUCTS were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by DEFENDANTS in a defective and unreasonably dangerous condition in ways which included, but were not limited to, one or more of the following particulars:

a.   They contained warnings insufficient to alert consumers, including Plaintiff herein, of the dangerous risks of PRODUCTS, and the comparative severity, duration and the extent of the risks and reactions;

b.   They contained warnings insufficient to alert consumers, including Plaintiff herein, of the propensity to cause a substantial increased risk of serious bodily harm, specifically including, but not limited to, uterine cancer;

**COMPLAINT FOR DAMAGES**

c.  They contained warnings insufficient to alert consumers, including Plaintiff herein, the dangerous EDCs or other toxic ingredients contained in PRODUCTS were made more dangerous by the nature by which PRODUCTS are used in their ordinary course, namely that the risk of lesions or burns and of associated heating processes involved in straightening or relaxing hair exacerbate the toxic effects of the EDCs or other chemicals contained in PRODUCTS; and

d.  The warnings that were given by the DEFENDANTS, if any, were not accurate, clear, and/or were ambiguous.

97.    Plaintiff could not have discovered any defect in PRODUCTS through the exercise of reasonable care.

98.    DEFENDANTS, as manufacturers, sellers and/or distributors of cosmetic PRODUCTS, are held to the level of knowledge of an expert in the field. Specifically, at all times material to this action, DEFENDANTS knew or should have known that the use of phthalates and other EDCs in hair PRODUCTS significantly increases the risk of uterine cancer, based upon scientific knowledge dating back decades.

99.    Plaintiff reasonably relied on the skill, superior knowledge, and judgment of DEFENDANTS.

100.    DEFENDANTS had a continuing duty to warn the Plaintiff of the dangers associated with the use of PRODUCTS.

101.    Plaintiff used PRODUCTS on her scalp for their intended purpose as hair relaxers and straighteners.

102.    Had Plaintiff received adequate warnings regarding the risks of PRODUCTS, Plaintiff would not have used them.

103.    As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of PRODUCTS, Plaintiff suffered injuries as set forth above.

21

**COMPLAINT FOR DAMAGES**

## **COUNT TWO**

### **STRICT PRODUCTS LIABILITY**

### **(DESIGN DEFECT)**

104. Plaintiff incorporates by reference paragraphs 1 through 101 as if fully set forth herein.

105. At all times material to this action, DEFENDANTS, and each of them, were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities, the cosmetic PRODUCTS, which are defective and unreasonably dangerous to users and/or consumers of the PRODUCTS, including Plaintiff.

106. At all times material to this action, PRODUCTS were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by DEFENDANTS in a defective and unreasonably dangerous condition in ways which included, but were not limited to, one or more of the following particulars:

    a. When placed in the stream of commerce, PRODUCTS contained unreasonably dangerous design defects and were not reasonably safe and fit for their intended or reasonably foreseeable purpose or as intended to be used, thereby subjecting users and/or consumers of the product, including Plaintiff, to risks which exceeded the benefits of the product;

    b. The PRODUCTS did not perform as safely as an ordinary consumer would have expected them to perform when used in an intended or reasonably foreseeable way;

    c. The PRODUCTS were insufficiently tested;

    d. The PRODUCTS caused harmful side effects that outweighed any potential utility;

22

**COMPLAINT FOR DAMAGES**

e.  The PRODUCTS were more dangerous than other hair straighteners and products on the market; and

f.  The PRODUCTS were not accompanied by adequate labeling or instructions for use to fully apprise the public and consumers, including Plaintiff, of the potential risks and serious side effects associated with its use.

107.  In light of the potential and actual risk of harm associated with the PRODUCTS' use, a reasonable person who had actual knowledge of this potential risk of harm would have concluded PRODUCTS should not have been marketed in that condition.

108.  There existed safer alternative designs, but DEFENDANTS chose to market a more dangerous design. Importantly, the PRODUCTS are inessential cosmetic products that do not treat or cure any serious disease. Further, safer alternatives, including fragrance-free PRODUCTS, have been readily available for decades.

109.  At all times material to this action, DEFENDANTS knew that PRODUCTS would be purchased by members of the general public and would be used by such purchasers without any inspections for defects, and would rely upon the representations made by DEFENDANTS on the product labels and in their marketing, including public statements and promotional and sales materials.

110.  At all times material to this action, PRODUCTS were expected to reach, and did reach, consumers in the State of California and throughout the United States, including Plaintiff, without substantial change in the condition in which they were sold.

111.  DEFENDANTS knew or should have known of the defective nature of PRODUCTS but continued to research, develop, design, test, manufacture, package, formulate, inspect, label, distribute, market, promote, sell and otherwise release these PRODUCTS into the stream of commerce so as to maximize sales

**COMPLAINT FOR DAMAGES**

and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by their PRODUCTS, including uterine cancer and other health problems.

112.    At all times, Plaintiff used PRODUCTS for their intended or reasonably foreseeable purpose as hair straighteners and relaxers.

113.    As a direct and proximate result of the defective and unreasonably dangerous condition of PRODUCTS and of their failure to perform safely, Plaintiff suffered injuries as set forth above.

## COUNT THREE

## STRICT PRODUCTS LIABILITY

## (MANUFACTURING DEFECT)

114.    Plaintiff incorporates by reference paragraphs 1 through 111 as if fully set forth herein.

115.    At all times material to this action, DEFENDANTS, and each of them, were responsible for manufacturing, testing, packaging, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities the cosmetic PRODUCTS, which are defective and unreasonably dangerous to users and/or consumers of the product, including Plaintiff.

116.    At all times material to this action, PRODUCTS were manufactured, distributed, and/or sold by DEFENDANTS in a defective and unreasonably dangerous condition in ways which included, but were not limited to, one or more of the following particulars:

   a.   When placed in the stream of commerce, PRODUCTS were of a substandard condition in that they contained contaminants which were not intended to be a part of the products, which rendered the products unreasonably dangerous when used for their intended and foreseeable purpose;

**COMPLAINT FOR DAMAGES**

b.  When placed in the stream of commerce, PRODUCTS were of a substandard condition in that they contained unintended or incorrect ratios or quantities of ingredients, which rendered the products unreasonably dangerous when used for their intended and foreseeable purpose; and/or

c.  When placed in the stream of commerce, PRODUCTS were of a substandard condition in that they contained contaminants which were not intended to be a part of the products, which rendered the products unreasonably dangerous and which caused them to differ from other ostensibly identical units of the same product line.

117.  In light of the potential and actual risk of harm associated with the PRODUCTS' use, a reasonable person who had actual knowledge of this potential risk of harm would have concluded PRODUCTS should not have been marketed in that condition.

118.  At all times relevant herein, DEFENDANTS knew that PRODUCTS would be purchased by members of the general public and would be used by such purchasers without any inspections for defects, and would rely upon the representations made by DEFENDANTS.

119.  At all times material to this action, PRODUCTS were expected to reach, and did reach, consumers in the State of California and throughout the United States, including Plaintiff, without substantial change in the condition in which they were sold.

120.  DEFENDANTS knew or should have known of the defective nature of PRODUCTS but continued to manufacture, package, formulate, inspect, label, distribute, sell and otherwise release these PRODUCTS into the stream of commerce so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by their PRODUCTS, including uterine cancer and other health problems.

25

**COMPLAINT FOR DAMAGES**

121. At all times, Plaintiff used PRODUCTS on her scalp for their intended or reasonably foreseeable purpose as hair straighteners and relaxers.

122. As a direct and proximate result of the defective and unreasonably dangerous condition of PRODUCTS and of their failure to perform safely, Plaintiff suffered injuries as set forth above.

## COUNT FOUR

### NEGLIGENT FAILURE TO RECALL

123. Plaintiff incorporates by reference paragraphs 1 through 120 as if fully set forth herein.

124. At all times material to this action, the DEFENDANTS were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities, the cosmetic PRODUCTS in the regular course of business, which are defective and unreasonably dangerous to users and/or consumers of the products, including Plaintiff.

125. At all times material to this action, the PRODUCTS were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by DEFENDANTS in a defective and unreasonably dangerous condition in ways which included, but were not limited to, the fact they contained EDCs which were known or should have been known cause uterine cancer, especially when used on the scalp in products that causes lesions or burns and in combination with heating techniques, which further increase the dermal absorption and risk of exposure to EDCs and PRODUCTS.

126. DEFENDANTS became aware of the dangerous nature of the PRODUCTS after PRODUCTS were sold to the public and after PRODUCTS were sold to Plaintiff. Specifically, at all times material to this action, DEFENDANTS knew or should have known that the use of phthalates and other EDCs in hair

**COMPLAINT FOR DAMAGES**

PRODUCTS significantly increases the risk of uterine cancer, based upon scientific knowledge dating back for decades.

127.   DEFENDANTS failed to recall PRODUCTS.

128.   A reasonable manufacturer, seller and/or distributor of dangerous cosmetic products that can cause cancer would under the circumstances have recalled PRODUCTS.

129.   Plaintiff could not have discovered any defect in PRODUCTS through the exercise of reasonable care.

130.   Plaintiff reasonably relied on the skill, superior knowledge, and judgment of DEFENDANTS.

131.   Had the PRODUCTS been properly recalled, Plaintiff would not have used them.

132.   As a direct and proximate result of the defective and the unreasonably dangerous and defective characteristics of PRODUCTS, Plaintiff suffered injuries as set forth above.

## COUNT FIVE

### NEGLIGENCE

133.   Plaintiff incorporates by reference paragraphs 1 through 130 as if fully set forth herein.

134.   At all times herein mentioned, DEFENDANTS had a duty to exercise reasonable care in the designing, developing, manufacturing, testing, packaging, distributing, labeling, and/or selling, and otherwise releasing into the stream of commerce, PRODUCTS.

135.   DEFENDANTS breached their duty of reasonable care to Plaintiff in that they negligently designed, tested, inspected, packaged, manufactured, distributed, and/or sold PRODUCTS. Specifically, DEFENDANTS failed to exercise reasonable care in ways which included, but were not limited to, one or more of the following particulars:

**COMPLAINT FOR DAMAGES**

a.  In their failure to warn or instruct and/or adequately warn or adequately instruct the public and consumers, including Plaintiff herein, of the dangerous and defective characteristics of PRODUCTS;

b.  In their failure to warn or instruct and/or adequately warn or adequately instruct the public and consumers, including Plaintiff herein, of the propensity of PRODUCTS to cause side effects, serious injury and death;

c.  In their failure to adequately research PRODUCTS;

d.  In representing that PRODUCTS were safe and effective for their intended use when, in fact, the PRODUCTS were unsafe for their intended use;

e.  In failing to perform appropriate, reliable and valid pre-market testing PRODUCTS;

f.  In failing to perform appropriate post-market testing of PRODUCTS;

g.  In using EDCs or other toxic chemicals in PRODUCTS;

h.  In failing to properly manufacture PRODUCTS;

i.  In failing to remove the PRODUCTS from the market when DEFENDANTS knew or should have known the PRODUCTS were defective;

j.  In failing to instruct the ultimate users, such as Plaintiff, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of uterine cancer; and

k.  In failing to perform appropriate post-market surveillance of PRODUCTS.

136.  DEFENDANTS knew or should have known that consumers, such as Plaintiff herein, would foreseeably suffer injury as a result of DEFENDANTS' failure to exercise reasonable and ordinary care.

137.  As a direct and proximate result of DEFENDANTS' carelessness and

**COMPLAINT FOR DAMAGES**

negligence, and of the unreasonably dangerous and defective characteristics of PRODUCTS, Plaintiff suffered severe and permanent injuries as alleged herein.

**COUNT SIX**

**BREACH OF IMPLIED WARRANTIES**

138.  Plaintiff incorporates by reference paragraphs 1 through 135 as if fully set forth herein.

139.  At all times, DEFENDANTS impliedly warranted that PRODUCTS were safe, effective and fit for use by consumers and users, including Plaintiff, for their intended use as a hair straightener and relaxer, that they were of merchantable quality, that they did not produce dangerous side effects, and that they were adequately tested and fit for their intended purpose.

140.  At the time of making these warranties, DEFENDANTS knew or should have known that, in fact, the representations and warranties were false, misleading, and untrue in that PRODUCTS were not safe, effective and fit for use by consumers and users, including Plaintiff, for their intended use as a hair straightener and relaxer, that they were not of merchantable quality, that they did produce dangerous side effects, including uterine cancer and other injuries as herein alleged, and that they were not adequately tested or fit for their intended purpose.

141.  Members of the public, including Plaintiff, reasonably relied upon the skill and judgment of DEFENDANTS and upon said implied warranties in using PRODUCTS.

142.  Plaintiff used PRODUCTS for their intended purpose as a hair relaxer and straightener.

143. DEFENDANTS breached said implied warranties, in that, PRODUCTS were not safe, effective and fit for their intended purpose as a hair straightener or relaxer, were not of merchantable quality, and, in fact, caused serious and potentially lethal side effects to consumers when used as recommended, including uterine cancer and other injuries as herein alleged.

29

**COMPLAINT FOR DAMAGES**

144.    Due to DEFENDANTS' wrongful conduct as alleged herein, Plaintiff could not have known about the nature of the risks and side effects associated with PRODUCTS until after she used them.

145.    As a direct and proximate result of the DEFENDANTS' breach of implied warranties and the unreasonably dangerous and defective characteristics of PRODUCTS, Plaintiff suffered injuries as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against DEFENDANTS on each of the above-referenced claims and causes of action, and as follows:

1. Awarding past and future non-economic damages in excess of $75,000, including, but not limited to pain, suffering, discomfort, fright, nervousness, anxiety, worry, apprehension, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding past and future economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

3. Prejudgment interest;

4. Post-judgment interest;

5. Awarding Plaintiff's reasonable attorneys' fees;

6. Awarding Plaintiff the costs of these proceedings; and

7. Such other and further relief as this Court deems just and proper.

///
///
///

30

**COMPLAINT FOR DAMAGES**

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: <u>January 20, 2023</u>                    Respectfully submitted by:


<u>/s/ Anne Andrews</u>
Anne Andrews, Esq. (SBN 103280)
John C. Thornton, Esq. (SBN 84492)
Sean Higgins, Esq. (SBN 266888)
ANDREWS & THORNTON
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (949) 748-1000
Facsimile: (949) 315-3540

**COMPLAINT FOR DAMAGES**